Filed 9/13/23  P. v. Robinson CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G061689 |
| v. | (Super. Ct. No. 17WF2455) |
| MICHAEL LARON ROBINSON, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed in part and reversed in part, with directions.

Aaron J. Schechter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Kathryn A. Kirschbaum and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

Michael Laron Robinson and two other men committed an armed robbery of a delivery truck in Huntington Beach. At a jury trial, the prosecution introduced evidence of a home invasion robbery, which happened about three weeks earlier in Calabasas. The same three men were alleged to have participated in both robberies. The jury convicted Robinson of kidnapping to commit robbery, carjacking, and robbery. The court sentenced Robinson to concurrent prison terms of 25 years to life, plus five years.

On appeal, Robinson claims: the trial court abused its discretion by admitting evidence about the Calabasas robbery (Evid. Code, § 1101, subd. (b)); the court failed to make a required finding at sentencing under Penal Code section 654; and there are errors in the abstract of judgment.[1]

We find the trial court did not abuse its discretion by admitting evidence under section 1101 (b). As far as sentencing, the Attorney General concedes the record is ambiguous under section 654 and there are errors in the abstract of judgment.

Out of an abundance of caution, we are reversing Robinson's sentence. We are directing the trial court to conduct a new sentencing hearing and to amend the abstract of judgment. In all other respects, the judgment is affirmed.


I

FACTS AND PROCEDURAL BACKGROUND

On August 24, 2017, Miguel Z. was employed by Fox Transportation, a company that delivers drugs and medical products to pharmacies and hospitals. Miguel started his workday at a drug manufacturing plant loading cardboard boxes and plastic totes into a box truck. After the truck was loaded, Miguel drove to his first delivery location, and then to Huntington Beach Hospital. Miguel arrived at 6:45 a.m., but the hospital did not accept deliveries until 7:00 a.m., so Miguel parked and waited in the

---

[1] Hereafter, Evidence Code section 1101, subdivision (b), will be referred to as section 1101 (b). All other undesignated statutory references are to the Penal Code.

2

delivery truck. While on his phone, Miguel noticed a man (later identified as Vernell White) approach the truck with a gun in his hand.

White told Miguel to open the driver's side door and also the passenger door. Miguel complied. Another person with a handgun (later identified as Carl DeLoach) entered through the passenger door. There were three seats in the truck, so Miguel was told to sit in the middle seat. White drove the truck away from the hospital while DeLoach held the weapon to Miguel's ribs. Miguel was told: "'Look down.'" "'Don't do nothing stupid.'" During this time, White was in contact with someone on his phone. Miguel overheard the person on the phone telling White, "no no this is not a good spot, go somewhere else or something like that." The truck eventually parked in the parking lot of the First Samoan Congregational Church. Surveillance video later revealed the truck was being followed by a car.

Miguel was told to get out and to unlock the back door of the truck. After he did so, Miguel was then told to climb into the back of the truck and sit down on the floor. While Miguel sat in the truck, he could feel a handgun on the back of his neck. Miguel heard a car approach the truck and noticed a third man (later identified as Robinson) out of the corner of his eye. White began rifling through the plastic totes in the back of the truck and pulled out gray bags from the totes, handing them to Robinson. The gray bags contained controlled medications, rather than over-the-counter medications. Robinson asked the two other men if they had taken Miguel's phone and wallet (Robinson later testified that only his phone was taken).

The three men finished removing items from the truck. They told Miguel not to turn around and then locked him inside. After hearing the car drive away, Miguel began banging on the truck and screaming for help. Huntington Beach police officers eventually arrived.

3

*The Investigation*

A Huntington Beach police officer interviewed Miguel, who said he recognized the individual that drove the carjacked truck (White) but that he did not know him by name. Miguel said White had previously worked at Fox Transportation. Miguel identified White and DeLoach in photographic lineups. Miguel said he would not be able to identify the third individual (Robinson) if he saw him again. Miguel described the third individual as a tall black male, weighing between 250 and 300 pounds. Robinson is six feet tall and weighs 275 pounds.

A Huntington Beach police detective watched a news story on television about a robbery in Calabasas. The detective noticed that two of the suspects in the Calabasas robbery resembled White and DeLoach. Additionally, the car used in the Calabasas robbery was similar to the car used in the Huntington Beach robbery. The detective contacted the Los Angeles County Sheriff's Department, which had released the video of the Calabasas robbery to the public. A few days after releasing the video, an anonymous caller identified DeLoach as one of the men in the video.

DNA samples were obtained from the pull cord on the back of the box truck and the door latch. The DNA matched Robinson's DNA. Beginning two days after the robbery, Robinson's phone was used to search for information about a Huntington Beach carjacking seven times. Those searches were later deleted. Robinson's cell phone search history also contained an entry that read, "'update Calabasas home invasion'" and another search for "'Calabasas robbery.'" White's phone contained communication between himself and Robinson. Robinson and DeLoach communicated via cell phone over a dozen times on the date of the Huntington Beach robbery.

Robinson's cell phone used a cell phone tower near the warehouse where Miguel loaded his truck. White called Robinson using a tower near the location where Miguel had made his first delivery. About five minutes before Miguel was approached in the delivery truck, Robinson's phone used a tower near Huntington Beach Hospital.

4

*Court Proceedings*

The prosecution filed an amended information charging Robinson with kidnapping to commit robbery, carjacking, and second degree robbery. The information further alleged two strike priors and two prior serious felony convictions. During motions in limine, the court admitted evidence under section 1101 (b) about the Calabasas robbery for the limited purpose of showing a common plan or scheme (the proffered evidence and the court's ruling will be covered in greater detail in the discussion section of this opinion).

Upon completion of the trial, the jury found Robinson guilty of the charged crimes. Robinson admitted the prior conviction allegations. The trial court sentenced Robinson to concurrent terms of 25 years to life for each of the convictions, plus five years for one of the serious felony priors (the sentencing hearing will be covered in greater detail in the discussion section).[2]

II

DISCUSSION

On appeal, Robinson claims the trial court: (A) erred by admitting evidence about the Calabasas robbery (§ 1101 (b)); (B) failed to make a ruling under the multiple punishment prohibition (§ 654); and (C) made errors in the abstract of judgment.

A. *Prior Uncharged Robbery*

Robinson argues the trial court abused its discretion by admitting evidence about the prior uncharged Calabasas robbery for the purpose of proving a common plan or scheme. (See § 1101 (b).) We disagree.

The trial court's determination of the admissibility of uncharged evidence

---

[2] White and Robinson were tried together; Deloach entered guilty pleas; White's appeal is currently in the briefing stage.

under section 1101 (b) is reviewed for abuse of discretion.  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)  "'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'"  (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329.)  This is a highly deferential standard of review, "'discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.'" (*People v. Green* (1995) 34 Cal.App.4th 165, 182–183.)

In this part of the discussion, we will:  1) review general principles of law; 2) summarize the evidence presented to the court and its ruling; and 3) analyze the facts as applied to the law.


### 1.  General Principles of Law

"Except as otherwise provided by statute, all relevant evidence is admissible."  (Evid. Code, § 351.)  "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)

Ordinarily, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion."  (Evid. Code, § 1101, subd. (a).)  However, there is nothing in the Evidence Code that "prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."  (§ 1101 (b).)

"The least degree of similarity . . . is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)  "A greater degree of similarity is required

6

in order to prove the existence of a common design or plan." (*Ibid*.) "The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity." (*Id*. at p. 403.)

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.) "'For example, a letter written by the defendant stating he planned to commit a certain offense would be relevant evidence in a subsequent prosecution of the defendant for committing that offense.'" (*People v. Phillips* (2022) 75 Cal.App.5th 643, 665–666.) "'The existence of such a design or plan also may be proved circumstantially by evidence that the defendant has performed acts having "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations."'" (*Ibid*.)

If a trial court finds the proffered evidence relevant under section 1101 (b), it must also consider whether the potential for prejudice outweighs the probative value. (See Evid. Code, § 352.) Generally, "'the probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Lewis* (2001) 25 Cal.4th 610, 637.)

A trial court's ruling under section 1101 (b) is reviewed based on the proffered evidence—or offer of proof—known to the court at the time of its ruling. (See *People v. Hendrix* (2013) 214 Cal.App.4th 216, 243.)

2. *The Proffered Evidence and the Trial Court's Ruling*

Prior to trial, the prosecution filed a trial brief, which included a statement of anticipated facts about the Huntington Beach robbery. The prosecution's brief also included a statement of anticipated facts about the Calabasas robbery:

7

"On August 6, 2017[,] a home invasion robbery was captured on video surveillance at the home where a mother and her two adult children resided. Surveillance cameras were located inside and outside the residence. Defendants White and DeLoach are seen walking up the driveway in orange construction vests after the mother walks outside to her vehicle and leaves for work. Prior to leaving, the mother asked . . . White and DeLoach what they were doing, and they replied they were working on repairs in the neighborhood. White and DeLoach are seen on video standing at the front door and [they] ring the doorbell. The 18-year-old son was inside the home, and answered the Ring doorbell through an intercom. He asked the men what they were doing, and the men said they work for the gas company and need to check the gas meter. The son opened the door and was attacked by White and DeLoach. One of the men used zip-ties on his wrists and a stun gun on his neck. On the video, DeLoach is seen standing over the son, who is ziptied on the ground in the living room. DeLoach is being aggressive with him, while the others ransack the house.

"A few minutes into the home invasion, the 25-year-old daughter arrives home. She enters the front-door, is immediately attacked, and thrown face-down into the ground. She is dragged to the bedroom where her attacker demands to know where the safe is located. There was no safe, and she pleaded with the man to not rape her. Eventually, all three men leave the house with approximately $200,000 in jewelry, electronics, and cash. The daughter was able to make her way to a phone in the house and called 911. [¶] Defendant Robinson is not seen on surveillance footage during the home invasion, but . . . it becomes clear he was part of the operation."

At a pretrial hearing, the prosecution sought to introduce the Calabasas robbery evidence under section 1101 (b). Robinson objected. After listening to arguments and reviewing the surveillance video from the Calabasas robbery, the trial court granted the prosecution's motion: "the Court ultimately finds that, under the 1101(b) common plan or scheme rubric, there is sufficient similarity to allow the

8

evidence from Calabasas in the trial on the Huntington Beach event." [3]

The trial court stated there was "sufficient similarity with the roles that each person appears to play in Calabasas and in Huntington Beach." The court found, "Mr. White appears to take the lead in both events. [He] appears, from my viewing of the video from the Calabasas event, to sort of be the lead person at the door, just like he's the lead person to approach Mr. Miguel Z. [¶] DeLoach is behind him, providing muscle. [¶] And Mr. Robinson, it is alleged — though never identified in Calabasas, his telephone, the same telephone, has put him squarely in the area of the Calabasas event. And we have other evidence that puts him as the driver sort of tagging along in the Huntington Beach events."

The trial court also stated the victims were detained in both cases, and "it cannot be overlooked that a mere 18 days elapses between events. That's critical in the Court's mind, also, how close in time the two events are." The court noted: "There's a firearm alleged to be used. Unclear if it's an actual firearm or not, but there's some appearance of a firearm by DeLoach in the — in the Huntington Beach event. And there's a taser used I think by DeLoach. Was it — I can't recall who specifically used it, but it was not White. I know that. And it was not Robinson in the Calabasas event."

The trial court concluded: "So, again, I do find sufficient similarity to allow the evidence to come in not for propensity to commit the violent acts in each of the cases but under common plan or scheme."

As far as weighing the evidence under Evidence Code section 352, the trial court said, "I've also done a 352 analysis and considered the prejudicial effect, and the Court does not find that it outweighs the probative value. To the contrary, the Calabasas event is highly probative and is not outweighed by the prejudicial effect nor the undue

---

[3] In an earlier hearing, the trial court stated: "the Court is going to reject the identity theory for why the 1101(b) prior should be admissible and admitted into evidence in this case. I don't think that the features are distinctive enough to rise to that level."

consumption of time or the possibility of misleading the jury." The court further ruled that it would give a limiting instruction during the initial instructions, and during the trial, just before the Calabasas testimony and evidence was presented to the jury. (See CALCRIM No. 375.)

The limiting instruction, CALCRIM No. 375, stated, in part: "If you decide that the defendants committed the uncharged offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether the defendants had a plan or scheme to commit the offenses alleged in this case. In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose except for the limited purpose of determining whether the defendants had a plan or scheme to commit the offenses alleged in this case."

In addition to an aiding and abetting jury instruction, the court instructed the jury on an uncharged conspiracy theory of liability as follows: "The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any member of the conspiracy done to help accomplish the goal of the conspiracy. [¶] To prove a defendant was a member of a conspiracy in this case, the People must prove that:

"1. The defendant intended to agree and did agree with the other defendant or with Carl DeLoach to commit Kidnapping for Robbery, Carjacking, or Robbery, or any lesser included crime.

"2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit Kidnapping for Robbery, Carjacking, or Robbery, or any lesser included crime.

"3. One of the defendants or both or Carl DeLoach or all of them committed at least one of the following overt acts to accomplish Kidnapping for Robbery, Carjacking, or Robbery, or any lesser included crime: [¶] a. White and DeLoach

10

approached Miguel Z.'s truck  [¶]  b. White and DeLoach entered Miguel Z.'s truck.  [¶]

c. Robinson directed White to continue driving.  [¶]  d. White, DeLoach, and Robinson

arrived at the First Samoan Congregational Church.  [¶]  e. White and Robinson extracted

the prescription drugs from the truck.  [¶]  f. DeLoach held a gun to Miguel Z.'s body.

"AND  [¶]  4. At least one of these overt acts was committed in California."

(CALCRIM No. 416.)

### 3. Application and Analysis

"It long has been established that evidence that a defendant was planning to

commit a crime is admissible to prove that the defendant later committed that crime:

'The presence of a design or plan to do or not to do a given act has probative value to

show that the act was in fact done or not done.  A plan is not always carried out, but it is

more or less likely to be carried out. . . .  There is no question about the relevancy in

general of such evidence . . . .'  [Citation.]  '*There is no situation in which a design to do

an act would be irrelevant to show the doing of the act*.'  [Citation]  'Evidence that the

defendant possessed a plan to commit the type of crime with which he or she is charged

is relevant to prove the defendant employed that plan and committed the charged

offense.'"  (*People v. Case* (2018) 5 Cal.5th 1, 39, italics added.)

Under a common plan or scheme analysis under 1101 (b), "evidence that

the defendant has committed uncharged criminal acts that are similar to the charged

offense may be relevant if these acts demonstrate circumstantially that the defendant

committed the charged offense pursuant to the same design or plan he or she used in

committing the uncharged acts."  (*People v. Ewoldt*, *supra*, 7 Cal.4th at p. 403.)

Here, Robinson's cell phone largely tracked the movements of the box

truck containing controlled medications as it went from where it was loaded at the

warehouse, then to Miguel's first delivery location, then to the Huntington Beach

hospital.  There were also many phone calls between White, DeLoach, and Robinson

11

during the kidnapping/carjacking/robbery. Further, the DNA evidence found on the delivery truck put Robinson precisely at the scene of the crime.

But in order to prove the elements of the conspiracy beyond a reasonable doubt—as well as the elements of each of the three crimes (kidnapping for purposes of robbery, carjacking, and robbery)—the prosecution was required to prove more than Robinson's identity, or his mere presence at the scene of the crime.[4]

We find that the trial court properly found the proffered Calabasas robbery evidence was relevant under the common plan or scheme rubric because that evidence was being offered by the prosecution for the relevant purpose of proving Robinson was involved in a conspiracy—a common plan or scheme—to commit the crimes in Huntington Beach (kidnapping for robbery, carjacking, and robbery), and Robinson then "'employed that plan and committed the charged offense[s].'" (See *People v. Case*, *supra*, 5 Cal.5h at p. 39.) That is, the Calabasas robbery evidence was plainly relevant under section 1101 (b) for the purpose of proving a common plan or scheme. (See *Ibid*.)

Moreover, a trial court's analysis of admissibility under a common scheme or plan rubric under 1101 (b) also properly "focuses on the manner in which the prior misconduct and the current crimes were committed, i.e., whether the defendant committed similar distinctive acts of misconduct against similar victims under similar circumstances." (*People v. Scheer* (1998) 68 Cal.App.4th 1009,1020.)

Here, the trial court analyzed the similarities between the charged Huntington Beach robbery, and the uncharged Calabasas robbery. The court found it significant that White, DeLoach and Robinson had assumed similar roles during both robberies. That is, White was the lead man, DeLoach provided muscle, and Robinson

---

[4] In fact, while discussing the circumstantial evidence presented by the prosecution during closing argument, Robinson's counsel told the jury, "What does the cell phone tower do? What does the DNA do? Puts him at the scene, makes him present at the scene. That mere presence alone is not enough to convict."

12

acted as the driver. The court also found other factors to be important: that the same phones were used in both incidents; a physical detention of the victims similarly occurred in both cases; a weapon was used in both cases; and the Calabasas robbery preceded the Huntington Beach robbery by only 18 days.

It is apparent that the trial court compared the Calabasas and Huntington Beach robberies and then made a reasoned decision under section 1101 (b), according to the proffered facts and the relevant principles of law. That is, the court correctly found the Calabasas robbery evidence was relevant for the purposes of proving a common plan or scheme in the Huntington Beach robbery, and then the court the appropriately focused its analysis under 1101 (b) "on the manner in which the prior misconduct and the current crimes were committed." (See *People v. Scheer*, *supra*, 68 Cal.App.4th at p. 1020.)

Further, the court also weighed the probative value of the evidence under Evidence Code section 352, as it was required to do. Indeed, the court took additional steps to limit the prejudicial impact of the Calabasas evidence by electing to read the applicable limiting instruction to the jury at multiple points during the trial. (See CALCRIM No. 375.)

In sum, we find the court was not arbitrary or capricious when it admitted the Calabasas evidence under section 1101 (b) for the purpose of proving a common plan or scheme. (See *People v. Foster*, *supra*, 50 Cal.4th at pp. 1328–1329.)

Robinson argues the trial court erred when it admitted evidence about the uncharged Calabasas robbery because there was "insufficient similarity" to the charged Huntington Beach robbery. Robinson points out some of the factual differences between the two robberies. For instance, Robinson notes there was a home invasion robbery in Calabasas, versus a robbery of a delivery truck in Huntington Beach. Robinson also notes that the robbers used disguises to enter the home in Calabasas, while the robbers did not use disguises to enter the truck in Huntington Beach.

Robinson is correct that there are factual differences between the two

crimes, but there are also factual similarities, as pointed out by the trial court. This is particularly true as to the manner in which the crimes were committed, or the similar roles of White, DeLoach, and Robinson during both crimes. (See *People v. Jones* (2013) 57 Cal.4th 899, 931 ["'the charged and uncharged crimes need not be mirror images of each other'"].) But under the deferential abuse of discretion standard of review, the more pertinent question for this court is: was the trial court either arbitrary or capricious in its ruling? Although perhaps a different judge would have made a different decision, we cannot say that the court somehow abused its discretion. (See *People v. Carmony* (2004) 33 Cal.4th 367, 377 ["a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it"].)

Robinson also argues the Calabasas robbery evidence was "extremely prejudicial because it deprived appellant of any chance of a fair trial on the crimes under which he was actually charged." (See Evid. Code, § 352.) We disagree.

"Evidence is not prejudicial, as that term is used in [an Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant." (*People v. Doolin* (2009) 45 Cal.4th 390, 438.) "'"The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging."'"'" (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439.)

Here, the trial court admitted the evidence concerning the Calabasas robbery for the limited purpose of showing a common plan or scheme in the Huntington Beach robbery, which is an allowable purpose under the statute. (See § 1101 (b).) Further, the court found the Calabasas evidence "highly probative" as compared to its prejudicial effect. (See Evid. Code, § 352.) In both armed robberies the victims were apparently treated in a similar manner. That is, the uncharged Calabasas robbery

14

evidence appears to have been no more emotionally inflammatory than the charged Huntington Beach robbery itself. And again, the court repeatedly instructed the jury regarding the limited purpose of the 1101 (b) evidence. To reiterate, we do not find that the trial court abused its discretion.

In any event, even if we were to find that the trial court's admission of the Calabasas robbery evidence constituted an abuse of discretion, we would not find it reasonably likely that an outcome more favorable to Robinson would have resulted had the 1101 (b) evidence not been admitted. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Clark* (2021) 62 Cal.App.5th 939, 968 [the state law error test is applied to the analysis of an alleged error under section 1101 (b)].)

In this case, Robinson's DNA was on the pull rope and the door latch of the carjacked truck. This was certainly powerful evidence. (See *District Attorney's Office for Third Judicial District v. Osborne* (2009) 557 U.S. 52, 62 ["DNA testing can provide powerful new evidence unlike anything known before"].)

Further, other relevant evidence showed Robinson's cell phone was in constant contact with both White and DeLoach's phones before, during, and after the instant crimes. Cell phone tower records also placed Robinson's cell phone near the warehouse where Miguel loaded the truck, at the location of Miguel's first delivery, and near the Huntington Beach Hospital when the carjacking occurred. And during the time Miguel was being carjacked, he testified he could overhear White on his cell phone discussing where to stop. Miguel heard the person on the phone telling White, "no no this is not a good spot, go somewhere else or something like that."

Additionally, in the days after the Huntington Beach robbery, Robinson's phone was used to search for information about a Huntington Beach carjacking and those searches were later deleted. Miguel also positively identified White and DeLoach as participants in the robbery. And although Miguel was unable to positively identify Robinson as the third participant, Robinson matched Miguel's general description.

15

Again, given the overwhelming amount of circumstantial evidence connecting Robinson to each of the various aspects of the Huntington Beach robbery, we find it is not reasonably probable that—had the Calabasas robbery evidence *not* been admitted under section 1101 (b)—a result more favorable to Robinson would have been achieved.  (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

*B.  Section 654*

Robinson argues "the trial court declined to make a finding as to whether section 654 applies to the three counts," this court should accept the "concession" by the Attorney General, and we should remand "'the matter to allow the trial court to determine the applicability of section 654 and to determine which, if any, counts are to be stayed under that section.'"  (Boldfacing omitted.)  We agree.[5]

"An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."  (§ 654.)  Section 654 serves to prevent multiple punishments of a defendant "by staying execution of sentence on all but one of those convictions."  (*People v. Ortega* (1998) 19 Cal.4th 686, 692.)

Section 654 may be applicable in cases where multiple statutory violations arise from a single act or course of conduct.  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252.)  To determine whether a course of criminal conduct is comprised of separate divisible acts, courts examine the "intent and objective of the actor."  (*Neal v. State of California* (1960) 55 Cal.2d 11, 22, disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331, 334, 344.)  If all of the offenses were incident to one objective, the

_____

[5] The Attorney General concedes the record is ambiguous and does not object to a remand as to the section 654 issue.  However, the Attorney General also alternatively argues Robinson "committed separate divisible acts and possessed different objectives for each offense and none of the offenses were incidental to each other."

defendant generally may be punished for only such offense. (*Neal*, at p. 19.)

"The trial court has 'broad latitude' to determine whether section 654 is factually applicable to a series of offenses." (*People v. Salazar* (2022) 80 Cal.App.5th 453, 459.) After making a factual determination under section 654, the court must ordinarily make a further discretionary determination as to whether a defendant's prison terms for multiple crimes "shall run concurrently or consecutively." (§ 669, subd. (a).)

"*Before determining* whether to impose either concurrent or consecutive sentences on all counts on which the defendant was convicted, the court *must determine* whether the proscription in section 654 against multiple punishments for the same act or omission requires a stay of execution of the sentence imposed on some of the counts. If a stay of execution is required due to the prohibition against multiple punishments for the same act, *the court has discretion* to choose which act or omission will be punished and which will be stayed." (Cal. Rules of Court, rule 4.424, italics added.)

The jury convicted Robinson of kidnapping to commit robbery, carjacking, and robbery. At sentencing, the trial court stated as to section 654: "Okay. Well, I'm going to 654 the counts just to get to the sentence that I intend to get to. I'm not making a legal conclusion, though, that the counts in fact do 654. I think it's quite likely that they do not 654. In fact, I think it's a possibility that -- that none of the counts 654. But at the moment I'm going to sidestep all of that by just agreeing to sentence him as if they do 654. I do want to reserve the right in the future to change the sentencing scheme if somehow this case were to ever end up in front of me again for a resentencing. I consider the issue of whether the counts 654 or not to be open right now. And I'm not sentencing him and agreeing to 654 them because I think that's the only—that's the only choice that I have. I'm just going to run the counts concurrent, though. In fact, I'm not going to stay them under 654; I'm just going to run the counts concurrent."

Under the applicable sentencing rules, the trial court was first required to make a factual determination under section 654, and then decide whether to run

17

Robinson's life terms either concurrently or consecutively. That is, the court was first required to determine whether the three crimes each had separate intents or objectives, or whether they were part of a continuous course of conduct. (See *People v. Salazar*, *supra*, 80 Cal.App.5th at p. 459.) The court's section 654 ruling is frankly difficult to decipher; however, it does appear that the court first decided to run Robinson's sentences concurrently, and then decided to "reserve" its section 654 decision to some later point "just to get to the sentence that I intend to get to." In short, it appears the court failed to comply with the mandatory sentencing procedures.

We find it highly unlikely that the trial court's error will affect the length of Robinson's prison term; however, out of an abundance of caution, we have decided it is appropriate to vacate the sentence and remand the matter, so the court can make clear its rulings under section 654. (See *People v. Braxton* (2004) 34 Cal.4th 798, 818–819 ["remand is appropriate . . . to allow the trial court to resolve one or more factual issues affecting the validity of the judgment but distinct from the issues submitted to the jury"].)

The trial court may "'reconsider all of its sentencing choices, subject only to the limitation that defendant not be sentenced to a greater aggregate term than the first sentence.'" (*People v. Kelly* (1999) 72 Cal.App.4th 842, 845.)

*C. Abstract of Judgment*

Robinson argues the abstract of judgment includes extra fines and fees. The Attorney General concedes there are discrepancies between the oral sentence and the document. (See *People v. Wynn* (2010) 184 Cal.App.4th 1210, 1221 ["a trial court's oral sentence governs"].) Because we are already remanding the matter for a new sentencing hearing, the trial court is directed to amend the abstract of judgment as necessary.

18

## III

## DISPOSITION

We reverse Robinson's sentence. We direct the court to conduct a new sentencing hearing on remand and to make a factual ruling under section 654. We further direct the court to modify the abstract of judgment as needed and to send a certified copy to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


GOETHALS, J.


19